```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA,            :
                                     :    10-cr-94-7 (JSR)
          -v-                        :
                                     :    OPINION AND ORDER
DONTAI CABRERA,                      :
                                     :
          Defendant.                 :
                                     :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

From approximately 2002 to 2010, Dontai Cabrera distributed crack and twice fired a gun at rival drug dealers. He was indicted for a narcotics conspiracy and a related firearms charge. He pled guilty to both charges three days before trial. Each conviction carried a mandatory minimum sentence of 10 years' imprisonment, and the Court was required to impose those sentences to run consecutively. At both the change-of-plea hearing and the sentencing, the Court questioned the Government's decision to seek a guilty plea that would require the defendant to serve at least twenty years in prison. The Government insisted that this plea was necessary and maintains to this day that a sentence of twenty years' imprisonment is no greater than necessary to effectuate the goals of criminal sentencing.

Until now, the Court was not permitted to consider the appropriateness of this sentence; its hands were tied by the mandatory minimums that Congress imposed. But now, Cabrera has

1

moved for a sentence reduction, and, as the Government concedes, extraordinary and compelling circumstances warrant a reduction. Therefore, the Court may, for the first time, fashion a sentence that is consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).

## LEGAL STANDARD

Cabrera moves for sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), which provides:

> [T]he court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction.

This remedy is sometimes colloquially referred to as "compassionate release," but, as the Second Circuit has explained, "compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reduction. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . ." United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020). And this Court has previously done so. See, e.g., United States v. Henareh, 486 F. Supp. 3d 744, 747 (S.D.N.Y. Jan. 13, 2021); United States v. Garcia, No. 11 CR. 989 (JSR), 2020 WL 7212962 (S.D.N.Y. Dec. 8, 2020).

2

A Court evaluating a motion under this statute must ask four questions: (1) has the defendant complied with the administrative exhaustion requirement, (2) has the defendant shown extraordinary and compelling reasons warranting a sentence reduction, (3) are the 18 U.S.C. § 3553(a) sentencing factors consistent with a lesser sentence than that previously imposed, and (4) is there a particular sentence reduction consistent with the § 3553(a) factors that is also warranted by extraordinary and compelling reasons?

I. Administrative Exhaustion

The defendant satisfied the administrative exhaustion requirement by filing several requests for compassionate release with the Warden during the past year, all of which were denied. The Government does not dispute this.

II. Extraordinary and Compelling Circumstances

The Government concedes that Cabrera has demonstrated an extraordinary and compelling reason for release. Specifically, Cabrera is at increased risk of suffering severe illness from COVID-19. As the Government states:

> Notwithstanding that the risk of reinfection at this time appears low, the Government concedes that, should the defendant be reinfected with COVID-19, he would be at risk for severe illness from COVID-19. On that basis, and in light of the defendant's other medical conditions, including his [prior] collapsed lung, the defendant has established an extraordinary and compelling reason for release. Because whether extraordinary and compelling reasons exist is a

3

threshold question to determining whether a sentence reduction is ultimately warranted under the Section 3553(a) factors, the Court need not reach the issue of whether the other factors advanced by the defendant would independently qualify as extraordinary and compelling reasons under the statute.

Gov't Opp. Br., ECF No. 291 ("Opp."), at 6 (internal quotation marks and citation omitted).

III. Section 3553(a) Factors

Next, the Court must decide whether a sentence of less than 240 months would be sufficient to comply with the goals of criminal sentencing, as stated in 18 U.S.C. § 3553(a). Cabrera has already served 130 months in prison, more than any of his codefendants, and he argues that a sentence of time served would satisfy the Section 3553(a) factors. The Government maintains that no reduction whatsoever is consistent with the § 3553(a) factors. The parties identify five principal considerations that bear on this inquiry, which the Court considers in turn.

    A.    *Nature and Seriousness of the Offense*

First, while Cabrera recognizes that he engaged in serious criminal conduct, he argues that twenty years' imprisonment is disproportionate to his offense. Cabrera's sentence is longer than the median sentence imposed for murder in the Southern District of New York and more than 50% longer than the median amount of time served for murder nationwide. Though Cabrera fired

4

a gun at rival drug dealers on two occasions, there is no indication that he injured, let alone killed, anyone.

The Government apparently believes that the nature and circumstances of the offense, and the fact of the defendant's plea, self-evidently support a twenty-year sentence. Opp. 7 (arguing simply that Cabrera "admitted to selling crack for nearly a decade and firing a gun" and "pleaded guilty pursuant to plea agreement knowing that he faced a mandatory-minimum 20-year sentence"). This is unpersuasive.

    B.   *Need to Avoid Unwarranted Sentencing Disparities*

Second, the defense argues that a sentence greater than time served would create an unwarranted sentencing disparity between Cabrera and his codefendants. Cabrera has already served more than any of his codefendants, who were sentenced to 130, 120, 120, 71, 22, and 20 months, respectively.

The Government responds that there is no unwarranted sentencing disparity because Cabrera "was responsible for conspiring to distribute and possess with intent to distribute the largest amount of crack [as compared to Miller, Oldyn, Patterson, and Topping]: between 840 grams and 2.8 kilograms by the defendant versus between 50 or 500 grams to 1.5 kilograms for the others. The only defendant who was responsible for more crack, Bermudez, possessed but did not discharge a firearm." Id. (citations omitted).

Nevertheless, it is far from clear that Cabrera conspired to distribute more crack than most of his codefendants. Based on the procedural history in this case, the difference in stipulated drug quantities in the defendants' plea agreements may reflect nothing more than an intervening change in the Sentencing Guidelines, rather than any actual difference in the defendants' relative culpability. Moreover, in the case of at least one codefendant (Tyrone Oldyn), the parties abandoned the stipulated drug range at sentencing, agreeing that Oldyn, like Cabrera, had distributed at least 0.84 kilograms of cocaine--a fact the Government highlighted when Oldyn sought a sentence reduction two years ago but neglects to mention now.

Like Cabrera, Oldyn was indicted on a narcotics conspiracy charge and a related firearms charge. In August 2010, Oldyn pled guilty to the narcotics conspiracy charge and the Government dropped the firearms charge (though Oldyn did not deny that he, like Cabrera, fired a gun at rival dealers on two occasions in connection with the conspiracy). Oldyn and the Government stipulated to the fact that Oldyn was responsible for conspiracy to distribute between 500 grams and 1.5 kilograms of crack. Under the 2007 version of the United States Sentencing Guidelines, which was in effect at the time of the plea, this range corresponded to a Base Offense Level of 34. See United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(c) (2007).

6

In November 2010, after Oldyn had pled guilty, the Guidelines were revised. The United States Sentencing Commission, in its wisdom, decided that a Base Offense Level of 34 should apply to offenses involving between 840 grams and 2.8 kilograms of crack, rather than between 500 grams and 1.5 kilograms, as it had previously specified. See U.S.S.G. § 2D1.1(c) (2010). One month later, in December 2010, Cabrera pled guilty. Cabrera stipulated to having dealt between 840 grams and 2.8 kilograms, giving him the exact same Base Offense Level as Oldyn.

So, what explains the higher quantity in Cabrera's plea, as opposed to Oldyn's? Did the Government have evidence that Cabrera dealt more crack than Oldyn? Perhaps. But context suggests that perhaps Oldyn and Cabrera were responsible for similar quantities of crack (somewhere between .84 and 1.5 kg), and the Government required Cabrera to stipulate to the higher range (.84-2.8 kg) simply because that was the new range specified in the Guidelines.

The Government now claims that these different ranges reflect actual differences in culpability, so Cabrera should be sentenced to about twice as much as Oldyn, but the Government sang a different tune ten years ago. As previously noted, Oldyn pled in August 2010, but he was sentenced in March 2011, after the new Guidelines took effect. The Court was required to make an independent finding of the Guidelines range at sentencing. Probation determined that the Base Offense Level was 34; it

7

purported to apply the November 2010 Guidelines, but it cited the stipulated range from the plea agreement (.5-1.5 kg), rather than the new range applicable in the 2010 Guidelines (.84-2.8 kg). See Oldyn PSR ¶ 50. Defense counsel objected, arguing that "new guidelines have been implemented. . . . [Because Oldyn only stipulated to a range of .5-1.5 kg,] [t]he record . . . is unclear as to whether Mr[.] Oldyn is responsible for more than 840 grams of crack. Accordingly, his base offense level should be 32 not 34." Oldyn Sentencing Br., ECF No. 122, at 3. But the Government agreed with Probation's calculation. Oldyn Sent. Tr. 1:11-12. And at sentencing, Oldyn's attorney conceded the point. Id. 3:12-22 ("I don't think that . . . there is any doubt that the government would be able to prove [distribution of] more than 840 grams.") Given the parties' agreement on this point (and rejecting an unrelated sentencing argument by Oldyn's counsel), the Court adopted the Guidelines range proffered by Probation and the Government. Oldyn Sent. Tr. 10:15-16. In sum, the Government's present argument that Cabrera is responsible for a greater drug quantity than Oldyn is inconsistent with the Court's prior finding that a Base Offense Level of 34 applied to Oldyn, which implicitly required the Court to find that Oldyn, like Cabrera, was responsible for distributing 0.84-2.8 kg of crack.[1]

---

[1] Even in the past two years the Government has tried to have it both ways. When Oldyn requested a sentence reduction under the

Despite all this, the Court does give some weight to the Government's representation that Cabrera was responsible for distributing more crack than his codefendants. Unlike Oldyn, who stipulated to 0.5-1.5 kg and later conceded the higher range, Cabrera stipulated to the higher range at the time of his plea. Perhaps there was, in fact, evidence that Cabrera conspired to distribute a greater quantity of crack, so perhaps the stipulation in Cabrera's plea reflects something other than the intervening change in the Guidelines. Whatever the reason, Cabrera did stipulate to being responsible for conspiring to distribute a higher range of crack, so the Court does see this as a basis for imposing a greater sentence on Cabrera than on his codefendants.

C.   *Cabrera's Background*

Third, Cabrera argues that the Court should consider his difficult upbringing. Cabrera's mother struggled severely with addiction and illnesses, including HIV/AIDS, and his father, while not entirely absent, did not take full responsibility for his son, either. Starting around age 7, Cabrera ostensibly lived with his father, but he more often stayed with a nearby grandmother, along

---

First Step Act in 2019, the Government brushed aside Oldyn's stipulated range (0.5-1.5 kg) and pointed out that Oldyn conceded at sentencing "that the government would be able to prove [distribution of] more than 840 grams." Gov't Br. Opp. Oldyn Mot. for Sentence Reduction, ECF No. 224 (quoting Oldyn Sent. Tr. 3:12-22). Now that Cabrera is the one requesting a reduction, the Government points to Oldyn's stipulated range, rather than to the range his counsel conceded and the Court adopted at sentencing.

9

with 6 adults and 7 other children, all boys. Cabrera explains that his grandfather cultivated an aggressive atmosphere, in which the boys were encouraged to physically compete for food and a place to sleep. As the only child without a parent in the home, and because he was darker-skinned, Cabrera was the subject of frequent bullying and struggled to compete for food.

Despite all this, Cabrera was a promising student until about eighth grade, when he began to participate in street life. He was the victim of a stabbing in high school, suffering a collapsed lung. He committed a misdemeanor--theft of a bicycle--and a state court sentenced him to 90 days in Riker's Island as a youthful offender. He became affiliated with the Rochambeau Gang, along with his six codefendants, and he dropped out of school at sixteen.

As a young adult, Cabrera, while continuing to deal drugs, also maintained close relationships with family members, including an aunt with whom he lived and her goddaughter. He developed a romantic relationship with Krystel Lopez, a childhood friend, who has supported Cabrera in prison and remains his girlfriend to this day. He also obtained several legitimate jobs (moving company, CVS store, hair salons, carpentry), and he returned to school for two brief stints, first at a technical high school and later at Monroe College studying culinary arts.

Many of Cabrera's family and friends wrote supportive letters when Cabrera was first sentenced, which this Court noted at the

time of sentencing but largely could not consider as a ground for reduction, given the mandatory minimums. Cabrera's loved ones again write supportive letters in support of the instant motion.

The defense argues that the Court, in sentencing Cabrera should consider that he has come a long way given his upbringing. The Court considers Cabrera's upbringing--and, especially, his minimal prior criminal history--to be important factors. The Government itself has focused on criminal history to distinguish otherwise comparable codefendants. When the Court asked the Government at Oldyn's sentencing, "do you view [Oldyn] as more culpable, less culpable, or roughly the same as . . . Mr. Patterson and Mr. Miller," Oldyn Sent. Tr. 18:23-25, the Government responded that "the one difference between [Oldyn] and other defendants is his criminal history" but that, otherwise, "the government views them as similarly situated." Id. 19:2-4, 8-9.[2] The Court sentenced Oldyn to 130 months, more than any of his codefendants who had been sentenced thus far, not because of drug quantities and the like, but rather because

> some recognition still has to be given in terms of further punishment to the fact when all is said and done, this gentleman's criminal history is more extensive that [the defendants who were sentenced to 120 months]. . . .
> The sentence of the court is, therefore, that the defendant is sentenced to 130 months in prison . . . .
> Those, if you will, extra 10 months reflect the court's view of the difference between this defendant and the

---

[2] To be clear, in this exchange the Court and counsel were not discussing Cabrera, who had not yet been sentenced.

11

other two, in terms of criminal history in particular . . . .

Id. 24:5-19. By the same token, some recognition has to be given to the fact that Cabrera's only prior crime was a misdemeanor bicycle theft.

### D. Trial Penalty

The Government offers one final reason for imposing such a severe sentence on Cabrera: "[n]o[] [other defendant] waited until three days before trial before pleading guilty." Opp. 8. Sadly, the practice of punishing defendants for exercising their constitutional right to trial by jury is baked into every aspect of the American criminal justice system. As the Court has elsewhere explained:

> [W]hat really puts the prosecutor in the driver's seat is the fact that the prosecutor--because of mandatory minimums, sentencing guidelines, and simply his ability to shape whatever charges are brought--can effectively dictate the sentence by how he drafts the indictment. For example, the prosecutor can agree with the defense counsel in a federal narcotics case that, if there is a plea bargain, the defendant will have to plead guilty only to the personal sale of a few ounces . . . but if the defendant does not plead guilty, he will be charged with the drug conspiracy of which his sale was a small part. . . . [I]n the past decade, the average prison sentence for federal narcotics defendants who entered into plea bargains has been around five years, while the average sentence for those few federal narcotics defendants who exercised their right to trial but were found guilty has been in excess of fifteen years—an average 'trial penalty' of ten years in prison. . . . The result is that, of the 2.2 million Americans now in jail or prison . . . over 1.5 million . . . are there as a result of plea bargains dictated by the government's prosecutors, who effectively dictate the sentences as

12

well. And most of the remaining 0.6 million . . ., while nominally awaiting trial, are really just waiting for word of what plea bargains the prosecutor will accept.

Jed S. Rakoff, Why the Innocent Plead Guilty and the Guilty Go Free 25-27 (2021).

This case perfectly illustrates the corrosive effects of the trial penalty. Cabrera did not even exercise his right to a trial; he pled guilty at the eleventh hour. But the Government punished him for his delay, all the same, forcing him to bear about twice the drug weight of his coconspirators. At oral argument on this motion, the Government claimed that it did not impose a "trial penalty" on Cabrera; rather, it gave a benefit to his codefendants, in exchange for their promptly giving up their rights. 3/22/21 Preliminary Tr. 5:10-17 (to be docketed) ("This isn't a penalty that Mr. Cabrera received for not timely pleading guilty. It's not like a superseding indictment was added shortly before trial that added additional counts. His codefendants also had the same right to go to trial and also faced the same 20-year mandatory minimum sentence had they gone to trial and been convicted. In the plea negotiation context, they were able to, by approaching the government early, receive a benefit."). But this is just another way of describing the penalty. The Government rewards those who surrender their constitutional rights, so few dare to exercise them. An innocent but rational man might plead guilty

13

and suffer a sentence of five years, rather than going to trial and risking the same sentence plus a ten-year trial penalty.

While the desire to impose a trial penalty seemingly motivated the Government and, thus, dictated the Court's mandatory minimum sentence at the time of the original sentence, that mandatory minimum does not constrain the Court on this motion. And while 18 U.S.C. § 3553(a) requires the Court to consider many factors, a trial penalty is not one of them. The Court refuses to punish a defendant for his choice to exercise his constitutional rights, or for his choice to delay pleading guilty until he has fully explored whether to give up those rights. To the extent that the Sentencing Guidelines suggest otherwise, the Court rejects them altogether. Therefore, the Court gives no weight to the fact that Cabrera "waited until three days before trial before pleading guilty." Opp. 8. Cf. United States v. Araujo, 539 F.2d 287, 292 (2d Cir. 1976) (reasoning that "augmentation of sentence" because a defendant "put the Government to its proof rather than plead guilty" is "improper" and observing that "[a] show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the Judge indulges a policy of penalizing those who elect to stand trial") (internal quotation marks and citation omitted)).

### E. Rehabilitation

The defense offers a final factor for the Court's consideration: evidence of Cabrera's rehabilitation. Cabrera has participated in more than 1000 hours of Bureau of Prison programming. He has been selected as a facilitator in the Alternatives to Violence Program, sharing his perspective on alternatives to violence with other inmates. He has read hundreds of books while incarcerated, and he began working towards college credit via a Mercer County College Program before COVID-19 temporarily stopped that program. He has taught multiple courses on Black History, as well as Yoga. And his disciplinary history has been spotless for nearly 10 years.

### F. Analysis

Putting this all together, in light of Cabrera's upbringing, his negligible criminal history, the similarity of his offense conduct to that of his co-defendants, and the evidence of rehabilitation, the Court finds that a sentence of substantially less than 240 months would be sufficient to comply with the purposes of criminal sentencing articulated in § 3553(a). However, given that Cabrera did stipulate to being responsible for distributing a larger quantity of narcotics than his codefendants (other than Bermudez, who did not fire a gun), the Court finds Cabrera to have been more culpable and will impose on Cabrera a sentence greater than the sentence imposed on his codefendants.

The Court concludes that a sentence of 156 months is sufficient to comply with the purposes of sentencing articulated in § 3553(a).

IV. Nexus

Finally, as the Court has regularly observed when granting sentence reductions short of immediate release, the Court must also consider the nexus requirement, i.e., the statutory requirement that the Court grant a reduction only if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added). This inquiry would be easy if the § 3553(a) factors warranted immediate release; the Government has conceded that Cabrera "has established an extraordinary and compelling reason for release" based on his medical condition. Opp. 6. But the § 3553(a) factors only permit a partial sentence reduction, so Cabrera's medical condition is less relevant. To be sure, Cabrera might be released in a few months with good time credit, but the Court does not control the decision of the Bureau of Prisons in that regard. Since the Court has concluded that the § 3553(a) factors require a further sentence of 26 months' imprisonment, there remains a possibility that Cabrera will be released after the pandemic has ended. Accordingly, the Court cannot find the reduction in this case is warranted solely based on Cabrera's medical condition.

The Court must therefore consider whether the other factors articulated by the defense are extraordinary and compelling and

16

warrant a partial reduction in sentence. The Court finds that they are and they do. Specifically, the Court considers, as described above, the extraordinary length of Cabrera's sentence relative to his offense, especially given his negligible criminal history; the significant, unwarranted disparity between Cabrera's sentence and the sentence of his codefendants; and Cabrera's substantial evidence of rehabilitation. The Court finds that these factors, together, demonstrate extraordinary and compelling circumstances warranting a sentence reduction.

For the foregoing reasons, Cabrera's motion for a sentence reduction is granted, and his sentence is modified to reduce the term of imprisonment from 240 months to 156 months. All other aspects of his sentence remain in full force and effect.

SO ORDERED.

Dated:   New York, NY
         March 31, 2021                    _____
                                            JED S. RAKOFF, U.S.D.J.